## JAMES FRANCIS ROCK *v.* STATE OF MARYLAND

[No. 360, September Term, 1968.]

*Decided April 25, 1969.*

*Graydon S. McKee, III,* for appellant.

*Donald Needle, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County,* and *Joseph C. Sauerwein, Assistant State's Attorney for Prince George's County,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

This case is another example of one in which the conviction must be set aside because the prosecution did not meet its burden of establishing that procedures were followed by the police which assure that an individual is accorded his privilege under the Fifth Amendment to the Constitution of the United States not to be compelled to incriminate himself. The necessary procedures were spelled out with specificity in *Miranda v. State of Arizona,* 384 U. S. 436, decided 13 June 1966, and are applicable to all cases the trial of which begin after that date. *Johnson v. State of New Jersey,* 384 U. S. 719, 721.[1] We have discussed and interpreted *Miranda* and applied its holding in a number of cases decided heretofore.

The appellant here was arrested on a warrant issued on 3 May 1968 charging that on 29 February 1968 he did unlawfully violate Md. Code, Art. 43, § 130, "to wit: Did practice medicine without a license."[2] The record does not disclose the date of his arrest but on 6 May 1968 cash bond was posted and the next day in the People's Court for Prince George's County the State prayed a jury trial. He was tried in the Circuit Court for Prince George's County on 1 July 1968 at a court trial, found guilty and after a pre-sentence investigation, sentence was suspended generally and he was placed on probation under the

---

**1.** The Supreme Court deemed its holding in *Miranda* not to be an innovation in our jurisprudence, but "an application of principles long recognized and applied in other settings." 384 U. S. 442. For a history of the cases leading to *Miranda* see *Dennis v. Warden,* 6 Md. App. 295.

**2.** At trial, the warrant as issued was amended in several respects to read substantially as above set forth.

supervision of the Department of Parole and Probation for one year.

## THE EVIDENCE

Testimony adduced at the trial showed that in February 1968 Marilyn Williams, a student at the University of Maryland, contacted the appellant by telephone on behalf of her roommate, Lauren Reeside, who was pregnant. The appellant told her "he knew a doctor and he had pills that she could take to abort the baby * * * I was supposed to give him $50 for the name of a doctor who performed an abortion." She met the appellant in person about the middle of February on the mall on the campus in "a little grove type thing." She did not have the money, a date was set for a later meeting and she gave him the $50.[3] On 29 February she met him again at her dormitory and gave him $3 for three pills, "part of a set." He told her he would give her the rest of the pills the next day, "and told me how she should take them * * * He said she was to take three a day, one in the morning, one in the afternoon and one in the evening, for four days." The appellant did not know that the pills were for Miss Reeside, who was there at the time. Miss Reeside saw the appellant take something out of his pocket, give it to Miss Williams who gave him something in exchange. Miss Williams gave the pills to Miss Reeside, who "took them * * * the first one that very same night." The appellant told Miss Williams that the pills were hormone pills and "the next day he gave me the rest of the pills to the set and I gave him the rest of the money * * * (there were) twelve pills in a set. I got three one day and the rest of them the next day, and one set cost $20. Then two weeks later I went to his dormitory, placed $20 in his mailbox, and took another set of pills that he had placed there for me." The appellant represented that "taken as directed they were supposed to induce abortion." The State then called the arresting officer. His entire examination as shown by the record was as follows:

"BY MR. SAUERWEIN: (Assistant State's Attorney)

---

3. The record is silent as to any further activity concerning the alleged doctor.

Q. Trooper Buckley, would you identify yourself to His Honor, please?

A. Trooper First-class W. G. Buckley, Maryland State Police, Investigation Division.

Q. Trooper Buckley, was there a time when you were involved in an investigation of an alleged incident of pills being given to induce abortion?

A. Yes, sir; there was.

Q. And if so, what did you do in connection with that investigation?

A. I received a report from Miss Marilyn Williams, stating in brief what she just testified to in court. After conferring with the representative of the State's Attorney's office I transported her to a magistrate in Hyattsville and she obtained a warrant charging Mr. James Francis Rock, the defendant, with practicing medicine without a license. I then served that warrant on Mr. Rock in his dormitory.

Q. And what transpired at this time?

A. I placed him under arrest, advised him of his rights, telling him he had a right to remain silent, but anything he said could be used against him, and that he had a right to counsel supplied by the State if he couldn't afford it himself.

When I met him I recall he had to go back to his room for some article of clothing, I think. When we got to his room he showed me a small bottle of vitamin pills, said that is all he had given the girl.

MR. SALMON: (Defense Counsel) Objection.

THE COURT: Ask your next question, sir.

BY MR. SAUERWEIN:

Q. Was there a time then when he related to you what the pills were?

A. Yes, sir.

Q. And what, if anything, did he say relevant to that?

MR. SALMON: Objection.

THE COURT: Overruled.

THE WITNESS: That the pills had been vitamin pills, a multiple vitamin type, one a day type, and he showed me a bottle of yellow pills. He said he had a witness who saw him scrape the identifying marks off the pills before he gave them to Miss Williams.

BY MR. SAUERWEIN:

Q. Did he tell you the reason for giving them to Miss Williams?

A. We had conversation regarding the girl being pregnant. He made the remark that she was too far along anyway.

Q. What girl?

A. He was under the impression Miss Williams was pregnant. He believed this, though she had told him, his statement, that it was for a friend.

MR. SAUERWEIN: I have nothing further.

MR. SALMON: No questions."

The Executive Secretary of the Board of Medical Examiners for the State of Maryland testified that the appellant was not then nor had been registered as a licensed doctor to practice medicine within the State of Maryland. The appellant offered no evidence.

### *THE ADMISSIBILITY OF THE APPELLANT'S STATEMENTS TO THE ARRESTING OFFICER*

The exclusionary rule enunciated in *Miranda* is:

"[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self incrimination." at 444.

"Custodial interrogation" means:

"[Q]uestioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." at 444.

The "procedural safeguards" to be used require the following measures:

> "Prior to any questioning, the person must be warned that he has the right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." at 444.

See 384 U. S. 478-479 for a summary of the holding after discussion in detail.

The testimony of Buckley establishes that the appellant was taken into custody at the time the warrant was served. But it does not demonstrate that the procedural safeguards were fully used. The appellant was not "clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation." [4] 384 U. S. 471. *Duckett v. State,* 3 Md. App. 563. Although he was told "that he had a right to counsel supplied by the State if he couldn't afford it himself", he was not told that in such event an attorney would be appointed for him "prior to any questioning if he so desires." at 479. *Miranda* recognizes that a defendant may waive effectuation of his rights, "provided the waiver is made voluntarily, knowingly and intelligently." at 444. For more detailed discussion of waiver in *Miranda* see pp. 470-471, 475-476. In no event could the appellant be deemed to have knowingly and intelligently waived his rights since he was not properly advised of them, but even had he been properly warned, the elements essential to constitute a waiver were not shown. See *Hale v. State,* 5 Md. App. 326, 330; *Duckett v. State, supra,* 574. cf. *Brown v. State,* 3 Md. App. 313, 322-323.

The warnings required and the waiver necessary are prerequisites to the admissibility of *any* statement made by a defendant.

> "No distinction can be drawn between statements

---

4. "[T]his warning is an absolute prerequisite to interrogation. No amount of circumstantial evidence that the person may have been aware of this right will suffice to stand in its stead. Only through such a warning is there ascertainable assurance that the accused was aware of this right." 384 U. S. 471-472.

which are direct confessions and statements which amount to 'admissions' of part or all of an offense.[5] The privilege against self-incrimination protects the individual from being compelled to incriminate himself in any manner; it does not distinguish degrees of incrimination. Similarily for precisely the same reason, no distinction may be drawn between inculpatory statements and statements alleged to be merely 'exculpatory'." 384 U. S. 476-477.

We think it clear that what was said by the appellant to the officer constituted "statements" within the meaning of *Miranda*.

As the appellant was in custody when he made the statements, as the content of the statements were such as were encompassed within *Miranda*, and as the required procedural safeguards were not shown to have been used, the question is whether the statements were nevertheless admissible as being otherwise without the ambit of *Miranda*.[6] *Miranda* does not purport to find all statements inadmissible.

"Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." at 478.

5. For distinction between "confession" and "admission" see *Stewart v. State*, 232 Md. 318.

6. There is no contention that the statements were compelled by force, threats, promises or inducements and were inadmissible as not freely and voluntarily made in that sense.

We have recognized that even though a person is in custody, statements made by him absent the procedural safeguards may, in certain circumstances, be properly admissible as not stemming from "interrogation" or questioning initiated by the police. *Bazzell v. State,* 6 Md. App. 194; *Richardson v. State,* 6 Md. App. 448; and cases cited in those opinions. But, because of the sparsity of the record here relating thereto, we are unable to ascertain whether the challenged statements were "volunteered" or stemmed from interrogation or resulted from questioning. We note that the officer said, "We had conversation regarding the girl being pregnant." We cannot conclude from the record that the statements admitted were not prohibited by the *Miranda* holding. Applying the voluntariness test on which has been impressed the holding of *Miranda,* we find that the statements were inadmissible, the evidence not being sufficient for the Court to be properly satisfied that they were the free and voluntary act of the accused. We think that the ruling of the trial court that they were admissible was not made within the required constitutional framework, and thus there was a clear abuse of discretion. See *Barnhart v. State,* 5 Md. App. 222.[7] *Miranda* prohibits the use of such statements by the prosecution, 384 U. S. at 444 and 479. Since they were here used, we must reverse the judgment. See *Orozco v. State of Texas,* 393 U. S. 822, decided 25 March 1969.

---

7. In *Barnhart* we discussed the procedure to be followed at trial when challenge is made to a statement obtained from a defendant by the police. We pointed out that the rule is that the trial court has the preliminary decision whether or not a statement was admissible and the trier of facts has the final determination whether it was voluntary and should be believed. The function of the court as to the preliminary decisions is separate and distinct from the trier of facts as to the ultimate determination and the rule is applicable to a case tried before the court or by a jury. 5 Md. App. 223-224. We note that a defendant's constitutional rights are violated when his challenged confession is introduced without the preliminary decision by the trial judge of its voluntariness *after an adequate hearing. Jackson v. Denno,* 378 U. S. 368. And see *Barnhart v. State, supra,* 226-227.

## THE CRIME OF PRACTICING MEDICINE WITHOUT A LICENSE

Although our holding makes it unnecessary that we consider the question presented whether the evidence was sufficient to sustain the conviction, we deem it advisable to construe such statutes as relate to the offense here charged. Sections 119-149S, Art. 43, Md. Code, are subtitled "Practitioners of Medicine" and are at times referred to as "The Medical Practice Act." Section 130 makes it a misdemeanor for any person to whom the provisions of the subtitle apply to practice or attempt to practice medicine or surgery in this State without first having obtained the required license. The appellant was charged and convicted of violating this section. Section 139 defines "practicing medicine" within the meaning of the subtitle. Although the section is written as one paragraph, its provisions may be divided into four major parts:

1) The first deals with the designation by a person that he is a practitioner of medicine. Any person shall be regarded as practicing medicine who shall append to his or her name the words or letters "Dr.", "Doctor", "M.D.", "D.O.", or any other title in connection with his name, with the intent thereby to imply that he or she is engaged in the art or science of healing, or in the practice of medicine in any of its branches;

2) The second deals with acts of a person. Any person who practices medicine or the art or science of healing shall be considered as a practitioner of medicine or surgery;

3) The third defines the phrase, "art or science of healing" and the phrase, "practice of medicine" to the extent "they shall be construed to include":

   a) "Operating on, professing to heal, prescribing for or otherwise diagnosing or treating any physical or mental ailment or supposed ailment of another; or

   b) "for hire or gratuity or compensation, either directly or indirectly paid, undertaking by ap-

pliance operation or treatment of whatever nature, to cure, heal, diagnose or treat any bodily or mental ailment or supposed ailment of another; or

c) "for hire, gratuity or compensation, either directly or indirectly paid, by or for any patient, undertaking to treat, heal, cure, drive away or remove any physical or mental ailment; or supposed ailment of another, by mental or other process, exercised or invoked on the part of either the medical practitioner of the patient or both."

4) The fourth sets forth exceptions to the applicability of the section.

On the evidence before the lower court the appellant's acts did not come within part (1) as he did not append any title to his name implying that he was engaged in the art of science of healing or the practice of medicine. His acts came within part (2) by practicing medicine if pregnancy may be considered as a "physical" or "bodily" "ailment" within part (3), for then he would have prescribed for or treated an ailment under (3a) or have undertaken by treatment to cure or treat an ailment under (3b) or have undertaken to treat, cure, drive away or remove an ailment by a process exercised by the patient and invoked by him under (3c). Neither the appellant nor his acts came within the exceptions set forth in part (4) and he was not licensed to practice medicine as required.

There was no expert testimony offered at the trial that pregnancy *per se* is or is not an ailment in the medical sense. We are mindful that we are judges, not medical doctors, and that neither the judge trying the case below nor the judges of this Court would be qualified to determine whether or not pregnancy is an ailment in the medical sense without enlightening testimony or authority.

It may be that pregnancy could cause an ailment under certain circumstances but at the trial Miss Reeside, after stating she was in fact pregnant, was asked: "Was there anything unhealthful about the pregnancy you know of?" and she replied,

"No." The trial court said in rendering its verdict, "It is true that you don't generally think of pregnancy as an ailment, but to a woman who was pregnant and desired not to be, she might suppose herself to have an ailment." We cannot construe the phrase, "supposed ailment" as used in the statute in this manner. We do not think that the word "supposed" can turn a condition which is not considered to be an ailment into an ailment. We think the phrase was included to encompass a situation where a condition considered to be an ailment would fall within the statute when it did not in fact exist if it was "supposed" that it existed. However, assuming that pregnancy is not an ailment in the medical sense, we do not feel that the word "ailment" as used in the statute, must be considered in the medical sense as it applies to pregnancy. Obstetrics is a recognized branch of medical science and the practice of medicine. It includes not only the delivery of a child but the pre-natal treatment of the expectant mother during her pregnancy. We cannot conceive that the legislature intended that a person could engage in the practice of obstetrics without a license to practice medicine. Support is given this conclusion by the express exception in part (4) to midwives. Midwives are provided for in §§ 82-94 of Art. 43. These sections provide that a person practicing midwifery shall be licensed. Section 82, in relevant part, proscribes that every person, not a legally qualified physician, attending for pay or hire, upon any lying-in woman, or woman in childbed, shall register as set forth. Violation of the section is a misdemeanor. Section 85 provides that a license for midwifery "* * * shall not confer upon any person any right to practice medicine, to prescribe or administer drugs, to undertake abnormal cases of confinement, or of any disease in connection with parturition * * *." It is unlawful under § 89 for a midwife to attend any except normal cases of childbirth, to make vaginal examinations, or to deliver retained placenta per vagina or attempt delivery by instruments or version. "In all cases in which the child is not delivered spontaneously within a reasonable time, the midwife shall notify a qualified practitioner of medicine immediately, and shall make no effort to deliver the child except under the direction and supervision of such physician." Section 90 makes it unlawful for any midwife in attendance at

the birth of a child to administer any drug to the said child or the mother thereof, except upon the advice of a qualified practitioner of medicine (except the proper use of nitrate of silver in the child's eyes as provided). Any midwife who shall be convicted of producing an abortion or inducing premature labor, shall, in addition to the other penalties provided by law, forfeit her license. § 94. Further under Art. 27, § 3, in effect at the time of the acts of the appellant, only a "regular practitioner of medicine," as therein provided, could lawfully produce an abortion, it being a crime for any other person to do so at any period of pregnancy. The proscriptions included knowingly selling or causing to be sold any medicine for that purpose.[8]

The Court of Appeals said in *Aitchinson v. State*, 204 Md. 538, 546:

> "It is absolutely clear from the definite language of the (Medical Practice) statute that the Legislature intended 'practice of medicine' to include not only the application of medicine to patients, but any practice of the art of healing disease and preserving health other than those special branches of the art that were expressly excepted."

It noted that most of the courts have given broad constructions to similar statutes. See *Hitchcock v. State*, 213 Md. 273. In view of the solicitude which the Legislature has displayed for the protection of the health of the people in the enactment of various laws relating thereto, as may be observed by the variety of subjects covered in the subtitles under Art. 43 (for example barbers and hairdressers must be licensed and investigation made as to the sanitary conditions of their shops, §§ 311-324) and the breadth of the language it has employed to define the practice of medicine, we think it clear that the legislative intent was that only a legally qualified physician or a duly licensed midwife (and such midwife only as expressly authorized) may

---

8. Art. 27, § 3 was repealed by Acts 1968, ch. 470, effective 1 July 1968. Ch. 470, § 3 provided that nothing in the Act applies to or affects the prosecution or penalty for any event or occurrence prior to 1 July 1968. See Art. 43, §§ 149E-G effective 1 July 1968.

treat a woman in pregnancy and deliver a child.[9] The conclusion is inescapable that pregnancy is an "ailment" within the meaning of the Medical Practice Act.

*Judgment reversed; case remanded for a new trial.*

9. However, nothing contained in Art. 43, § 139 "shall be construed to apply to gratuitous services."