# WILLIAM GARDNER *v.* STATE OF MARYLAND

[No. 342, September Term, 1969.]

*Decided September 30, 1970.*

The cause was argued before MURPHY, C.J., and AN-
DERSON, MORTON, ORTH, and THOMPSON, JJ.

*Archie D. Williams* for appellant.

*Donald Needle, Assistant Attorney General,* with
whom were *Francis B. Burch, Attorney General, Charles
E. Moylan, Jr., State's Attorney for Baltimore City,* and
*Fred K. Grant, Assistant State's Attorney for Baltimore
City,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

Henry Kravetz, a taxicab driver, was shot and killed
in an attempt to rob him. William Gardner was arrested
and while in custody made an inculpatory verbal state-
ment as to the homicide and attempted robbery. He was
charged with the murder and attempted robbery with a
deadly weapon of Kravetz and also with the robbery with
a deadly weapon of another taxi driver, Edward Balcer.
He went to trial before a jury in the Criminal Court of
Baltimore. His statement was offered by the State over
challenge and upon evidence adduced out of the jury's
presence the court made the required preliminary de-
termination that it was voluntary and ruled it to be ad-

missible. Evidence as to its voluntariness was then adduced before the jury and the statement was received in evidence. See *Barnhart v. State,* 5 Md. App. 222; *Cooper v. State,* 1 Md. App. 190. The jury rendered verdicts of guilty of murder in the first degree without capital punishment, and guilty of the attempted robbery of Kravetz and the robbery of Balcer as charged. The court imposed a life sentence on the murder conviction and a sentence of 20 years on each of the other convictions, the sentence on the conviction of the robbery of Balcer to run consecutively and that on the conviction of the attempted robbery of Kravetz to run concurrently. See *Darby v. State,* 3 Md. App. 407.

We remand the case without entertaining a final order affirming, reversing or modifying the judgments with direction to the lower court to conduct further proceedings with respect to the propriety of the admission into evidence of the statement of appellant. Maryland Rule 1071 a.

The matter of the admissibility of the statement as presented and argued on appeal does not go to the basic standard of voluntariness [1] but rather to the holdings of *Miranda v. Arizona,* 384 U. S. 436 which are impressed on that standard. And as to *Miranda* appellant does not assert that the required warnings were not in fact given. The crux of the issue is what happened after the warnings were explained to appellant.

The State offered two witnesses on the preliminary issue of voluntariness. Detective George Christian of the Baltimore City Police Department, Criminal Investigation Division, Homicide Squad, had been a police officer for 10 years. He testified that "in company with Ser-

---

1. "The basic standard governing the admissibility of an extra-judicial statement is whether, considering the totality of the circumstances, the statement is voluntary. * * * To be voluntary, a statement cannot be 'extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.' " *Keller v. State,* 2 Md. App. 623, 626-627, quoting *Malloy v. Hogan,* 378 U. S. 1, 7. See *Dennis v. Warden,* 6 Md. App. 295.

geant Fred Buckmaster we interviewed Mr. William Gardner in the Headquarters Building, the Homicide Squad room." Before any questioning "* * * I advised him of his rights and after each right I asked him if he understood and he shook his head 'yes' that he understood." The rights were read to appellant from a police form and the evidence is plain that all the required rights were given. Christian testified that when he explained to appellant that "if you agree to make a statement you may stop at any time and request the presence of a lawyer and no further questions will be asked of you," and asked if he understood, appellant stated "yes." At this point, you know what I mean, he stated that he didn't wish to make a statement." According to Christian, appellant "* * * sat there for awhile and looked startled to me — appeared to be startled. He just sat there and he shook his head like this and he commenced to talking." Christian indicated appellant shook his head "in the affirmative." Appellant said he had shot the cab driver, told the police the whereabouts of the gun (the police recovered it) and who had been present when the crimes were committed. At this point in the proceedings the Assistant State's Attorney asked the witness, "Now you said before that Mr. Gardner said he didn't want to make a statement. Can you explain that in the light of the fact that he admitted the shooting of Henry Kravetz?" The answer was, "Yes sir. I think—well, not think, but I asked him about a typewritten statement, did he want to give a typewritten statement and he refused, of course." The transcript reads:

"Q. All right, sir. And was this after he had admitted shooting Henry Kravetz?

A. No, sir.

Q. All right. He said that he did not want to give a typewritten statement then, is that correct?

A. Yes sir, a signed, typewritten statement.

Q. All right. And then — now, what in reconstructing the conversation between you and

Mr. Gardner, after he said he didn't want to give a signed typewritten statement, what then occurred? What was the next thing that occurred?

A. Well, of course, I didn't say anything to him. He sat there. He looked to be in a dazed state earlier and then he just shook his head like this and then he said, 'I shot him", but he also stated it was an accident. [indicating]. I did not get to that in here, but it is in my report. The gun went off by accident."

Christian said that appellant's mother was present, ("there was only two of us there outside of his mother") that appellant did not ask for a lawyer at any time, that he did not say to Christian that he could not afford a lawyer and wanted one appointed, nor did his mother say that she wanted a lawyer for him before anything was said. Christian did not remember the length of time which elapsed between the time the warnings were given and the time the oral admissions were completed but it was less than an hour. On cross-examination Christian thought that when he arrived at the interrogation room appellant, his mother ("he is under twenty-one years of age") and Sergeant Buckmaster were already there. The mother "continuously advised him to say nothing." Defense counsel asked if the mother was present when appellant "first told you that he didn't want to give a statement which you later qualified to mean that he didn't want to give a typewritten signed statement?" Christian thought she was sitting right beside appellant. In response to further questions by defense counsel Christian said that he said nothing else to appellant after appellant said "he didn't want to give a statement." "I didn't say anything else to him." Both he and Buckmaster sat there. "We were getting notes and stuff together for the folder." He reiterated that there was no conversation between him and appellant after appellant said he did not want "to sign any statement." The confession was not in response to any question that Christian directed at appellant. Asked

why appellant was not taken back to his cell after he said he did not want to give a statement, Christian said that they just continued working on the file. "It is no hurry to get him back. If he doesn't say anything, he doesn't say anything. Nobody forces him to say anything. * * * There is no rule to state that I have to take him back downstairs after he refuses to give a statement." The State went back over the ground on redirect examination. The transcript reads:

"Q. (by Assistant State's Attorney) Now, when you finished each of the rights, after the last one, did you ask the Defendant whether he desired, as you said, to sign a typewritten statement?

A. (by Christian) No sir. After I advised him of his rights I told him that I would like to talk to him relative to the shooting of the cab driver and I explained to him certain things in this folder whereas to the cab driver was shot and killed at Madison and McCulloh Street and would he care to give me a typewritten statement relative to this.

Q. All right. After telling him about the case that you wanted to talk to him about and asking him whether he cared to give a typewritten statement on it, his response was what?

A. No, he didn't want to give a typewritten statement, he said.

Q. All right. And did he use those words?

A. Yes sir, he said, 'No, I don't want to give a typewritten statement.'

Q. All right. Now, when he said, 'No, I don't want to give a typewritten statement', was there any remark made to him by you or by Sergeant Buckmaster, any further remark or any question asked of him?

A. No sir.

Q. All right. Now, how long was it — you say then that you started getting your file together. How long was it, if you can recall, between the time when the Defendant said he did not want to give a typewritten statement and the time when you say he began to nod his head and then stated that he shot the cab driver?

A. I'd say maybe four or five minutes had elapsed.

Q. In that period of time, neither you or Sergeant Buckmaster had asked him a question?

A. No sir.

Q. And in that period of time had either the Defendant or the mother requested that an attorney be present?

A. No sir.

Q. Had either the Defendant or the mother requested that the Defendant then be taken out of that room?

A. No sir.

Q. And without any further questioning or prompting or conversation by you or the sergeant, he made his statement about shooting the driver, is that correct?

A. Yes sir.

Q. And during — during the time when he made the statement about admitting the shooting and saying it was accidental and naming the persons that were with him, did either you or Sergeant Buckmaster interrupt with questions?

A. No sir, I just let him talk.

Q. All right, And how long would you say he talked on in giving this information?

A. Well, the longer he talked the more at ease he got. He really got at ease. Just very at ease.

Q. All right. And without any interruptions or

questioning then he gave this complete state-
ment then or the completed — whatever—
his complete oral statement, is that correct?

A. Yes sir.

Q. Now, what did he say when he finally fin-
ished talking? What did he say to indicate
to you that he had finished talking?

A. He stopped.

Q. All right. And when he stopped, did you or
Sergeant Buckmaster ask him any further
questions?

A. I don't recall.

Q. Do you recall, sir, when it was that the
mother told the Defendant not to say any-
thing?

A. She was telling him when — right when I
was advising him of his rights.

Q. I see. While you were advising him of each
of his rights and asking him if he under-
stood them, the mother was telling him not
to say anything?

A. Yes sir.

Q. Did the mother attempt to interrupt him
while he was telling about the shooting of
the driver?

A. She didn't say anything.

Q. She didn't say anything during that period
of time?

A. No sir."

On recross-examination Christian said that he asked ap-
pellant "for a typewritten signed statement and he stated
that he would not give a signed statement." Appellant
had also refused to sign an explanation of rights form
before he made the confession.

Sergeant Buckmaster testified that when he arrived at
the interrogation room appellant and Christian were
there—"whether anybody else was there at that partic-
ular time, I don't recall." He believed appellant said that
his mother was downstairs and Buckmaster went down

and got her. Buckmaster said he was "the one who advised" appellant of his constitutional rights but it soon became evident that he did not remember whether he or Christian read the warnings. He obviated this perplexity by thereafter stating either that "we" read them to him or that they were read to him. In any event, after the warnings were given appellant refused to sign the explanation of rights form, saying, "I am not signing anything." Buckmaster explained to him that by signing the form no rights were thereby waived but appellant said, "I am still not signing anything." But soon after he refused to sign the explanation of rights form the second time ("it was hardly any time at all"), he confessed. During this short time lapse "the only thing I can remember—well, we didn't do too much talking actually when we asked him about it. I mean, it wasn't no repeated questions. He more or less came out with it, although his mother continuously — she just said to him, 'You don't have to say anything. Don't say anything. You don't have to tell them anything.' Things like that." Buckmaster was asked, "In spite of her saying these things during this period of time * * * in spite of her telling him not to say anything * * * during this period of time, He suddenly begun to tell about shooting the man?" Buckmaster answered, "Well, no, we did ask him, we said — well, look now, of course, sir, it has been since September and the exact wording — but, in essence we said, 'Now, you want to go ahead and tell us about this thing? I mean, what part you took in it? Did you do this thing on purpose? Was it an accident?' I don't know. There were just several questions of that sort put to him. And he said, 'Well, yeah, I tell you, I was the one that had the gun, but it went off accidentally.' But it wasn't a — it was a short period of time. It didn't last too long." The State relinquished the witness. On cross-examination Buckmaster could not say "who said exactly what or who asked exactly which question" which prompted the confession after appellant had twice refused to sign the explanation of rights form. "This was the theme of the

questions that were asked, sir. Now exactly — now, it has been quite some time ago now — who directed each specific sentence to the man I can't say."

The testimony of the two police officers called on behalf of the State cannot be reconciled as to what occurred after the warnings were given. Christian said at first that appellant refused to make a statement. In explanation of why he in fact then confessed, Christian said it was a typewritten statement appellant refused to give. Later in his testimony he said that he had asked appellant if he would give a typewritten signed statement and appellant stated he would not give a signed statement. He was positive, however, that the confession was not the product of any questions asked by either him or Buckmaster after appellant refused to give a signed statement. "And without any further questioning or prompting or conversation by [Christian] or the sergeant, he made his statement about shooting the driver * * *." Christian did not explain why all questioning of appellant ceased merely because he refused to give a written statement. The sergeant did not say that appellant refused to make a statement or to give a signed or typewritten statement. He testified that appellant twice refused to sign the explanation of rights form, stating he was not going to sign anything. It appeared from the sergeant's testimony that appellant was interrogated after he refused to sign the explanation of rights form and while the sergeant could not recall the exact questions asked, he made their tenor plain. It seems from the sergeant's testimony that appellant's confession was a direct result of the questions asked him; we note that appellant grasped the suggestion that the gun was fired by accident.

The State permitted the evidence to remain in this posture. Appellant called his mother as a witness. She said she went to the police station immediately after her son was arrested. They were questioning him when she arrived but he told her in response to her inquiry that he had not signed anything. She told the police she did not want him to sign a statement and she told her son, "And

don't give no statement at all to no one." She was in the interrogation room about ten minutes. "The officer was talking to my son. I wasn't talking to my son the whole time I was in there. The officer kept questioning him and was trying to get him to make this statement and sign it." Her son told the police he was "not going to give no statement, he is not going to sign anything." He made no statement nor did he sign anything while she was present.

In stating its reasons why the statement was admissible the lower court found that the statement was voluntary in the traditional sense, that the full panoply of the *Miranda* warnings had been given and that appellant understood them. The evidence in law was sufficient to support those findings. But left unresolved, so far as we can ascertain from the record, are questions raised by the evidence which we believe to be material to the admissibility *vel non* of the statement.

> "Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise." *Miranda,* at 473-474. And see *id.* at 444-445.

We have not construed this to mean that once the individual undergoing custodial interrogation invokes his privilege to remain silent he cannot thereafter, under any circumstances, be questioned, at least in the absence of counsel.[2] We said in *Conway v. State,* 7 Md. App. 400 at 410:

---

2. When counsel is present in such case there may be some circumstances in which further questioning would be permissible in any event. See *Miranda,* note 44 at p. 474.

> "[T]he individual's right to remain silent, though once invoked, may subsequently, under appropriate circumstances, be waived within the rule governing the waiver of federal constitutional rights articulated in *Johnson v. Zerbst*, 304 U. S. 458, which was adopted in *Miranda*, *viz.*, an intentional relinquishment or abandonment of a known right or privilege, the determination of which depends in each case upon the particular facts and circumstances surrounding that case." [3]

But "[i]f the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. * * * Since the State is responsible for establishing the isolated circumstances under which the interrogation takes place and has the only means of making available corroborated evidence of warnings given during incommunicado interrogations, the burden is rightly on its shoulders." We have found that a waiver in express terms is not required; a waiver is valid when the totality of the circumstances—the attendant facts of the case—implicitly show that the accused voluntarily and intelligently relinquished his *Miranda* rights and made a statement. *Brown v. State*, 3 Md. App. 313. And see *Anderson v. State*, 6 Md. App. 688 and *Rock v. State*, 6 Md. App. 618 for a discussion of waiver of the *Miranda* rights. And we note that *Miranda* does "not purport to find all confessions inadmissible. * * * Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but

---

**3.** "The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." *Miranda* at 444.

whether he can be interrogated. Volunteered statements of any kind are not barred by the Fifth Amendment * * *." *Miranda* at 478.

The remarks of the lower court in determining that the statement was admissible do not indicate that it considered whether or not appellant had invoked the privilege to remain silent either absolutely or conditionally [4] or whether or not he had effectively waived this right. It is true that in reaching the preliminary decision as to the voluntariness of the statement the court need not find beyond a reasonable doubt that the confession was voluntary; the only duty of the trial court at that point is to decide whether the *prima facie* proof was such as to establish that the confession was freely and voluntarily made. So the preliminary decision of the court as to the admissibility of the confession, made within the required constitutional framework, will not be disturbed on appeal unless there was a clear abuse of discretion. *Barnhart v. State, supra,* at 224-226. But in determining whether the court made its decision within the required constitutional framework we must do so within the rule that "[w]hen constitutional rights turn on the resolution of a factual dispute we are duty bound to make an independent examination of the evidence in the record." *Brookhart v. Janis,* 384 U. S. 1, note 4 at p. 4. When we do so here we find that the testimony describing the circumstances surrounding the making of the statement is conflicting and that the conflicts are not resolved by the lower court despite its function to judge the credibility of the witnesses and to weigh their testimony. We think that the record here is not sufficient for us to fulfill the duty of constitutional adjudication resting upon us requiring that the question whether the Due Process Clause of the Four-

---

4. The court said at one point in the hearing, "The continued questioning after his refusal seems to me is an element that has to be included in the totality of the circumstances when I am faced with the ultimate ruling whether or not I am going to admit the confession." It is not clear whether the "refusal" referred to was considered by the court to be a refusal to make any statement or merely a refusal to sign a written statement. See *Conway v. State, supra.*

teenth Amendment has been violated by admission into evidence of a coerced confession be the subject of an independent determination by us. See *Escobedo v. Illinois*, 378 U. S. 478, note 4 at p. 484. It is for this reason we remand for further proceedings. The lower court shall, on the evidence in the record adduced on the issue of the admissibility of the statement out of the presence of the jury and on the introduction of such additional evidence as it may deem advisable or in the interests of justice, determine:

1) Did appellant indicate in any manner at any time before or during questioning that he wished to remain silent? [5]
2) If so, did interrogation cease?
3) In any event, did appellant waive his constitutional right to remain silent? [6]

Upon the conclusion of such proceedings the record shall be transmitted to this Court.

> *Case remanded without affirming, reversing or modifying the judgments for further proceedings in accordance with this opinion. Mandate to issue forthwith.*

---

5. We note that if in fact appellant did not indicate an unconditional desire to remain silent but merely a wish not to sign a written statement, further questioning in an attempt to obtain a verbal statement would ordinarily not be precluded. See *State v. Gutierrez*, 449 P. 2d 334 (N. Mex.); *United States v. Burley*, 280 F. Supp. 672 (U.S.D.C.Del.).

6. These questions, left unresolved by the court, were brought squarely before it at the hearing on the admissibility of the statement by defense counsel's argument. He said: "Everybody is agreed at least that Mr. Gardner at least on one or two occasions at the very minimum declined to give a statement and declined to talk to the officers. I think at this point that the officers had no right to go any further." He also pointed out that Buckmaster "testified that there were questions continuously asked of the Defendant after he had refused to give a statement. And Officer Christian came in and categorically denied asking any questions at all. * * * Now I think we have a situation here where you have conflicting testimony of such significant proportions between officers of the State and I think that under those circumstances the Court is entitled to give great weight to the testimony of the mother * * *."