623 A.2d 690

**Kevin BELL, a/k/a Kevin Rich**

v.

**STATE of Maryland.**

**No. 1054, Sept. Term, 1992.**

Court of Special Appeals of Maryland.

April 28, 1993.

48

Sherrie B. Glasser, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Ann N. Bosse, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Stuart O. Simms, State's Atty. for Baltimore City, on the brief), Baltimore, for appellee.

Submitted before MOYLAN, BISHOP and ROSALYN B. BELL,* JJ.

---

* ROSALYN B. BELL, J., now retired, participated in the hearing and decision of this case while an active member of this Court; after being recalled pursuant to the Constitution of Maryland, Article IV, Sections 3A and 18(b), she also participated in the adoption of this opinion.

MOYLAN, Judge.

We approach the decision we are called upon to make in this case with the same discomfort with which we approached a similar decision in *Dixon v. State*, 23 Md.App. 19, 20–21, 327 A.2d 516 (1974):

> "With the possible exception of the 'dropsy' cases, no aspect of Fourth Amendment litigation has afflicted law enforcement with the yawning credibility gap wrought by inventory searches." (footnote omitted).

*See also Manalansan v. State*, 45 Md.App. 667, 668, 415 A.2d 308 (1980).

The appellant, Kevin Bell, was convicted by a Baltimore City jury of the possession of cocaine with intent to distribute. On this appeal, he raises two contentions:

> 1) that at the pretrial hearing on his Motion to Suppress Physical Evidence as having been seized in violation of the Fourth Amendment, the hearing judge erroneously denied his Motion; and

> 2) that the evidence was not legally sufficient to support the conviction.

### The Standard of Appellate Review

The Fourth Amendment judgment we are called upon to make is whether the ostensible inventorying that produced the incriminating evidence in issue was a *bona fide* inventory or was a mere subterfuge for an investigative search. In *Manalansan v. State, supra,* we discussed the appropriate standard of review, 45 Md.App. at 669, 415 A.2d 308:

> "It is, furthermore, clear that in assessing the ultimate constitutional fact of whether a police intrusion into an automobile is a bona fide inventory or a subterfuge for an otherwise unpermitted investigative search, we are required to make our own independent, reflective judgment. *Walker v. State*, 12 Md.App. 684, 694–695, 280 A.2d 260; *Gardner v. State*, 10 Md.App. 233, 245, 269 A.2d 186; *Reagan v. State*, 4 Md.App. 590, 601, 244 A.2d 623. Judge Liss stated this

standard of review most recently in *Herring v. State,* 43 Md.App. 211, 220–221, 404 A.2d 1087 [1979]:

'In order to justify the policeman's conduct in this case, we would be required to conclude from our own independent examination of the record that the detective acted in good faith in making the alleged inventory search, and not as a subterfuge to conduct a warrantless search for investigative purposes.'

See also *Cleckley v. State,* 42 Md.App. 80, 399 A.2d 903 [1979]."

We had earlier employed the same standard of review in *Dixon v. State,* where we observed, 23 Md.App. at 36, 327 A.2d 516:

"That the trial court found as a 'fact' that there was a bona fide inventory does not preclude us from making our own independent judgment and it does not limit us to a 'clearly erroneous' standard of review."

### *The Purpose of an Inventory*

It is also necessary to bear clearly in mind the exclusive purpose of an inventory search. It is not investigative in purpose and is not designed to further in any way the goal of criminal detection. Nothing less than probable cause to believe that evidence is present will ever serve as adequate justification to make a search for evidence. The police inventorying of the contents of an automobile (or other repository) is, indeed, not even a part of their investigative function. It is an aspect, rather, of their community caretaking function. It is designed to safeguard the personal property of individuals whose property might otherwise be exposed to undue risk by virtue of some police action. It is also designed to serve the closely-related function of safeguarding the police from false claims of theft under circumstances where they are required to take the property of others into their custody. In *Manalansan v. State,* we discussed in some depth the limited nature of police inventorying, 45 Md.App. at 668, 415 A.2d 308:

"We begin with the bedrock proposition that the inventorying of the contents of an automobile is not a constitution-

ally-permitted investigative technique. A search for evidence within an automobile may only be undertaken pursuant to a validly issued search and seizure warrant, *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); warrantlessly where there is probable cause to believe that the automobile contains evidence of crime coupled with an exigency excusing the warrant requirement. *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); warrantlessly where all or some of the automobile lies within the reach, lunge or grasp of an arrestee, *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), and *Peterson v. State,* 15 Md.App. 478, 292 A.2d 714; or warrantlessly pursuant to valid consent, *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The inventorying of the contents of an automobile on the other hand, serves a noninvestigative purpose."

In *Waine v. State,* 37 Md.App. 222, 232, 377 A.2d 509 (1977), Judge Thompson for this Court summarized the then-recent Supreme Court decision of *South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), and set out the noninvestigative purpose of the automobile (or other) inventory:

"Three purposes which serve to legitimatize warrantless police intrusions into the interior of an automobile following its seizure were listed: (1) protection of the police from danger; (2) protection of the police against claims and disputes over lost or stolen property; and (3) protection of the owner's property while it remains in police custody. Inventory searches, therefore, are not conducted in order to discover evidence of crime. They are conducted in accordance with police departmental policy to list what is in police custody. Probable cause to seek a search warrant would be irrelevant."

### *The Facts in this Case*

The testimony at the suppression hearing strongly suggests that the police were looking for evidence of narcotics viola-

tions. At approximately 5:30 P.M. on May 15, 1991, Officers Mark Daugherty, William Brown, and Attlay Williams were driving an unmarked car in the vicinity of Woodland and Homer Avenues in Baltimore City. The officers described the neighborhood as a high crime area generally and an area known for heavy narcotics activity specifically. The officers observed a group of four or five young men, the appellant among them, "scatter" at the approach of the three strangers. The appellant walked away from the rest of the group and approached the passenger door of a "red Chevy Geo." According to Officer Daugherty, the appellant made "a hand movement as [if he were] placing something in the vehicle." He then shut the car door and dropped a plastic bag next to the car.

The officers did not immediately move in on the appellant or any of the other members of the group. They continued to patrol the general area and, approximately ten minutes later, returned to the intersection of Woodland and Homer Avenues. Upon their return, the appellant was standing next to the open passenger door of the red Chevy Geo. At the approach of the "strangers," he closed the door and dropped what appeared to be "a vial, a white object" into the three-inch window opening. At that point, the three officers got out of their automobile and placed the appellant under arrest. A search of his person revealed a "black diamond watch" and a beeper.

The police testimony itself revealed that their focus on the automobile was *investigative* in nature from the very outset. Immediately after arresting the appellant, the officers asked him to consent to the search of the car. According to their testimony, he refused and told them that they would have to obtain a search warrant if they desired to look into the car. Even in the face of that denial of consent, the police interest in the car did not abate.

Officer Brown walked over to the car and observed a vial of white powder lying in open view on the floor of the front passenger seat. A supervising officer, Sergeant Cappucino, arrived on the scene and conferred with the officers. Ostensibly under the authority of the *Carroll* Doctrine, the police

warrantlessly opened the door of the automobile and retrieved the vial of white powder that had been spotted on the floor. That apparently ended the *Carroll* Doctrine probe into the automobile.

Officer Brown continued his testimonial narrative: "Once we did that, we called for a wagon and began an inventory of the vehicle since we were going to tow it." Between the passenger seat and the driver's seat, Officer Brown found a "Fila" bag. Inside the Fila bag were several baggies. The first contained five bundles containing ten vials each. A second contained "bundles of ten each wrapped in a rubber band." A third baggie contained "three bundles of ten each and one bundle with nine vials." Officer Brown testified that the substance in the various containers had been "packaged for street distribution." Chemical analysis revealed the substance to be cocaine.

### The Initial Carroll Doctrine Probe

We have no difficulty upholding the initial and limited police entry into the automobile to retrieve the vial containing white powder. It was investigative in nature and was based upon probable cause. The neighborhood was known to the police as one with a high level of drug activity. The appellant was one of four or five young males who immediately dispersed at the approach of "strangers," quite possibly the police. At the first approach of these "strangers," the appellant made a furtive hand movement as if placing something in the automobile, immediately shut the door, and then dropped what later turned out to be an empty plastic bag onto the ground beside the car. Ten minutes later, when the "strangers" approached the second time, the appellant was again observed standing beside the open passenger door. On that occasion, he dropped what appeared to be "a vial, a white object" into the window opening. Looking through the transparent window of the automobile, as was their right, the police observed on the floor a vial containing white powder. It was inside the window where the appellant had just been seen throwing something in. The appellant, moreover, was in

possession of a beeper, a common instrumentality in the narcotics traffic. *Cf. Best v. State*, 79 Md.App. 241, 260, 556 A.2d 701 (1989).

Under the totality of the circumstances, the police had, we hold, the necessary probable cause required by the *Carroll* Doctrine to justify a warrantless entry into the automobile for the specific purpose of retrieving the vial of suspected cocaine. Exigency, the other requirement for a warrantless *Carroll* Doctrine entry, was demonstrably present. A parked car containing possible narcotics in a zone of high narcotics activity was a goose waiting to be plucked. At the very least, it was a repository of possible inculpatory evidence that would have been long gone before the police team could secure a search warrant. The single vial of white powder was legitimately seized. It, however, was not the essential object of the appellant's suppression motion.

■ What followed that limited seizure was beyond the permitted scope of this particular "automobile exception" entry. The permitted scope of a *Carroll* Doctrine search, of course, is whatever is necessary to serve the purpose of *that* particular search. The only probable cause asserted by the police was probable cause to believe that the single vial observed lying on the floor in front of the passenger seat contained contraband narcotics. Accordingly, the automobile was warrantlessly entered and that vial was retrieved. At that point, the entire purpose that justified the warrantless entry in the first place had been fulfilled. The police obligation, therefore, was to terminate the search, its purpose already having been fully served. The *Carroll* Doctrine does not permit further and gratuitous rummaging about. As was explained in R. Gilbert & C. Moylan, *Criminal Law: Practice and Procedure* 333 (1983):

"If there is probable cause to believe that an automobile contains stolen truck tires (coupled with the attendant exigency), then the police may stop the automobile in question and search it warrantlessly under the *Carroll* Doctrine. Once they have found the stolen truck tires, however, it is incumbent upon them to terminate—to get out. Any fur-

ther search would be exploratory in nature and would be more than was necessary to serve the purpose that triggered the initial entry into the automobile. This, by definition, would be a scope violation. This, by definition, would be a failure on the part of the police to minimize the intrusion."

Although an argument might someday be made for extending a search such as this based upon some almost Newtonian proposition that the discovery of *some* contraband suggests the likely presence of *more* contraband yet to be discovered, it is enough to note that no such argument was made by the State in this case, either at the suppression hearing or before us.

### The Warrantless Arrest

We also have no difficulty in upholding the legitimacy of the appellant's warrantless arrest. Although the police may arguably have "jumped the gun" by a few moments, the arguable prematurity of the arrest is beside the point. Once Officer Brown looked through the window of the automobile and observed that what the appellant had been seen to throw away was a transparent vial containing white powder, the arrest ripened into one based on probable cause even if it had not been that moments before. The same probable cause that justified the initial warrantless entry into the automobile to retrieve the suspected contraband was also probable cause to arrest the appellant for having been, moments before, in unlawful possession of that contraband.

The legality of the arrest, however, gets the State nowhere. It has not proffered any argument that the subsequent processing of the automobile was in some way an extended search incident to lawful arrest. *See New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981).

### Standing to Object: A Nonissue

At trial, it developed that the red Chevy Geo in which the contraband was found belonged to one Camille C. Howard. The appellant had no demonstrated connection with

the automobile, other than having twice shut the door and having once dumped a vial into the car through a partially opened window. At trial, the appellant testified that the car did not belong to him. He testified further that he had told this to the police when they first approached him. Under the circumstances, the State might have had a very viable challenge to the standing of the appellant to question their entry into the automobile. Such challenge, however, was never made. It is too late at the appellate stage to raise an issue not timely raised at the suppression hearing. *Steagald v. United States*, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981).

### *The Inventory*

▇▇▇ As the proponent of incriminating evidence warrantlessly seized, the State bears the burden of justifying the seizure. It has not persuaded us in this case that the police but randomly chanced upon the incriminating evidence while engaged in an innocuous and noninvestigative inventorying of personal property. We cannot help but be skeptical of the claim in many respects.

In the first place, the burden is upon the State to demonstrate that the inventorying of personal property, particularly that found in an automobile, is pursuant to some general administrative procedure in that regard. *South Dakota v. Opperman* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976); *Colorado v. Bertine*, 479 U.S. 367, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987); *Florida v. Wells*, 495 U.S. 1, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990). There was no clear demonstration in this case of the existence of any administrative directive or procedure or of the fact that the police were following such a procedure in this instance.

We are even more dubious about the police claim that it was necessary to inventory the contents of the automobile because the automobile had to be impounded. Why, we wonder, did the automobile have to be impounded? Officer Brown acknowledged that the car was lawfully parked. It did not pose a nuisance or an impediment to traffic in any way. A similar claim was made by the police in *Manalansan v. State*. Our

response in this case to the claim is essentially what it was in that case:

"Upon our own independent, constitutional appraisal, we conclude that the further search of the automobile was pursuant to 'an investigatory police motive' and was, therefore, unreasonable. Several factors combine to lead us to this conclusion. The first was the very decision to take the automobile into custody in the first instance. Everything that transpired in this case occurred within the shadow of the Southern Police Station. There is no indication that when the appellant was arrested from his automobile that his automobile was not then at rest in a legitimate parking spot. If, *arguendo*, it was not, there was no showing of why the appellant himself or one of the officers could not have moved the automobile, within a few feet and within a few seconds, into a parking space, locked it and left it. The reasonableness of leaving the automobile essentially where it was is all the more prominent in view of the fact that the appellant was about to be taken into the station to be booked on a charge of simple assault by spitting. He would have been released on his own recognizance or on nominal bond within a very brief time and would then have been able to return to his car and to drive home. The necessity for impounding the car was not remotely demonstrated. It is simply not reasonable to tow a car away to avoid moving it to the curb, if such minimal movement was indeed necessary."

*Id.*, 45 Md.App. at 671–672, 415 A.2d 308.

We found equally disingenuous the police decision to impound an automobile in *Dixon v. State*:

"The necessity for impounding the car was not remotely demonstrated. The appellant's car, at the time of arrest, was on the parking lot of the Howard County Courthouse. It was still before noon on a working day. There was no apparent danger to the car or to its contents. The car, in turn, posed no irremediable danger to the flow of traffic. Either the appellant himself or one of the officers, within a few feet and within a few seconds, could have safely parked

it, locked it and left it. The officer was asked why he called the tow truck. In view of the obvious and simple alternative of moving the car a few feet into a readily available parking space, the answer strikes us as disingenuous, 'It was parked out here in the lane that runs through the Court House parking lot and was obstructing traffic.' It is simply not reasonable to tow a car away to avoid moving it to the curb." (footnote omitted).

*Id.*, 23 Md.App. at 38–39, 327 A.2d 516.

The decision to impound the automobile is even more questionable in view of the fact that the automobile did not belong to the appellant but to Camille C. Howard. We can only imagine the chagrin of Ms. Howard, possibly returning ten minutes later with a heavily laden grocery cart only to find an empty place against the curb.[1]

The State's response might be that it was not learned that the automobile belonged to Ms. Howard until the time of trial. We take notice, however, of the fact that a police car contains a radio, which connects with a computer that accesses the information in the files of the Motor Vehicle Administration. The most casual stop of a motorist routinely generates information as to the ownership of the stopped vehicle within a minute or two. We cannot imagine why a source so readily available to the police in the furtherance of an investigation is not equally readily available in the possible disservice of an investigation. It would seem helpful for the police to know whose car is being towed and whose property is being inventoried.

A *bona fide* inventory implies the making of an inventory list and the turning over of a copy of that list to the property owner. There was no indication at the suppression hearing that such a list was ever begun, let alone completed. There was no indication that the appellant was served a copy of such list. The burden of proof, of course, as to the *bona fide* nature

---

1. At the other end of the imagination spectrum, of course, we can also imagine the chagrin of Ms. Howard at having her automobile forfeited for having been an instrumentality in the narcotics traffic.

of the inventory was on the State. It may well be that the discovery of the contraband suddenly distracted the police from their community care-taking function. We nonetheless are subject to the same nagging doubt we suffered in *Dixon v. State,* 23 Md.App. at 40, 327 A.2d 516:

"Curiously, no inventory list was ever turned over to the appellant or produced in court. Apparently none was ever made. In terms of the officer's attentions, solicitude for personalty was easily cuckolded and lightly forgotten once the more attractive rival of the seizure of potentially incriminating evidence appeared in the field. In the light of such easy inconstancy of purpose, it is difficult to credit significantly the asserted initial commitment."

It is equally difficult here to credit significantly the asserted initial commitment. We find, even as we did in *Dixon v. State,* that:

". . . we cannot help but conclude that the officer's resort to an inventory rationale was a case more of investigative opportunism than of genuine solicitude for personal property."

*Id.* at 38, 327 A.2d 516.

For the guidance of the trial court should the State decide to retry the appellant and should a double jeopardy issue arise, we hold that the evidence in this case was legally sufficient to support the conviction.

*JUDGMENT REVERSED; COSTS TO BE PAID BY MAYOR AND CITY COUNCIL OF BALTIMORE.*