1 A.3d 488

**Terry Keith EPPS, Jr.**

v.

**STATE of Maryland.**

No. 0334, Sept. Term, 2009.

Court of Special Appeals of Maryland.

May 28, 2010.

Reconsideration Denied Sept. 14, 2010.

688

Marc A. DeSimone, Jr. (Paul B. DeWolfe, Public Defender, on the brief), Baltimore, MD, for appellant.

Daniel J. Jawor (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for appellee.

Panel: ZARNOCH, WRIGHT and CHARLES E. MOYLAN, JR. (Retired, Specially Assigned), JJ.

MOYLAN, J.

May the State (or in this case the trial court) switch Fourth Amendment theories after a suppression hearing has been, in all but the formal filing of its ruling, wrapped up? Theoretically, if all conditions are favorable, it is possible, but it is an unusual procedure that is generally frowned upon. We frown upon it here.

## Round One

The appellant, Terry Keith Epps, Jr., was convicted by a Harford County jury on June 27, 2006, of the possession of cocaine with the intent to distribute and with the possession of marijuana. In initially appealing those convictions, the appellant's only contention was that a pretrial suppression hearing had erroneously failed to rule that the drugs had been seized from him in violation of the Fourth Amendment.

That suppression hearing had taken place on May 3, 2006. The appellant had been a passenger in a car subjected to a traffic stop, for traveling at 60 miles per hour in a 50–mile–per–hour zone, on April 20, 2005. The car had been driven by the appellant's brother, Stephon David Epps, who was also charged with driving on an expired license and with failing to produce a registration card for the vehicle. The evidence consisted of the testimony of 1) Deputy Sheriff Jeffrey Gerres, who made the initial traffic stop and then centered his attention primarily on the driver, Stephon Epps; and 2) Deputy Sheriff Javier Moro, who responded to the scene almost immediately as a back-up officer and who then directed his attention primarily to the appellant, who was a front-seat passenger.

The appellant was ultimately asked to lift his shirt and, as he did, Deputy Moro observed "a small, clear plastic baggie to be protruding from the top of his pants." The appellant was still seated in the car as this took place. The deputies recovered the baggie and it, in turn, was found to contain both a small bag of marijuana and 13 small bags of cocaine. The Fourth Amendment issue was, as it still is, how the initial traffic confrontation proceeded to the point of the appellant's lifting his shirt.

As the evidence was fully developed and then argued before the suppression hearing judge, the doctrinal road not taken was the one mapped out by *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). It would have required the State to establish, en route, 1) reasonable articulable suspicion for the initial stop of the appellant, 2) compliance with the scope

limitations of a *Terry* stop, 3) reasonable articulable suspicion that the appellant might be armed, and 4) compliance with the scope limitations of a *Terry* frisk. Although some of the testimony of the two deputies might have had, allusively, some bearing on one or more of those four requirements, the State eschewed any reliance on that constitutional theory and sought, instead, to establish that the appellant's lifting of his shirt was a voluntary consensual act, free of any constitutional barnacles, an act done in a context wherein the Fourth Amendment did not even apply. That doctrinal route was followed by the suppression hearing judge, as he denied the appellant's motion:

> I find there was a valid traffic stop for speeding, that Deputy Moro arrived as a back-up officer. He observed conduct on the part of the defendant causing concern about weapons. That conduct is undisputed. It was also observed by Deputy Gerres.
>
> *Deputy Moro asked the defendant if he had weapons,* and the defendant said no. *I don't think there's anything wrong with that question in the context of the situation.*
>
> *I find that he asked the defendant if he would lift his shirt. The defendant voluntarily complied with that.* The baggie was seen. *So I find that there's no illegal search.* Therefore, *the motion to suppress will be denied.*

(Emphasis supplied).

Following the denial of his motion to suppress, the appellant was tried by a jury and convicted. On his first appeal to this Court, he contended, *inter alia,* that his motion to suppress had been erroneously denied.

### First Appeal to This Court

This Court filed its unpublished opinion in the case of *Epps v. State,* No. 2342, September Term, 2006, on March 19, 2008 (*"Epps I "*). We reversed the suppression ruling. We remanded "the case to the circuit court for the limited purpose of determining whether the evidence seized as a result of the search should have been suppressed in light of" *Brendlin v.*

*California,* 551 U.S. 249, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007). The only Fourth Amendment issue before this Court was, just as the only issue decided by the suppression hearing had been, whether the appellant's lifting of his shirt was an act of voluntary consent.

■ In assessing the voluntariness of consent, the legal status of the person ostensibly giving such consent is a critical factor for the judge to consider. Is the individual totally free of any official restraint, as in a true mere accosting situation, so that the Fourth Amendment is completely inapplicable? Or is he subject to some official restraint (a *Terry* stop or an arrest)? If the latter, is it a reasonable and constitutional restraint or an unreasonable and unconstitutional one? All other conditions being precisely the same, the constitutional status of the consenter can well be dispositive of the voluntariness of the consent. This Court spoke of the significance of the status factor in the voluntariness equation in *Graham v. State,* 146 Md.App. 327, 350–51, 807 A.2d 75 (2002):

> *A critical factor bearing on voluntariness is the legal status of the appellant as of the moment the consent was requested and ostensibly given. If the appellant either 1) was not subject to any Fourth Amendment detention of his person or 2) was subject to lawful detention, the voluntariness standard of Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), *would apply. Florida v. Royer,* 460 U.S. 491, 502, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). *If,* on the other hand, *the appellant was being subjected to unlawful restraint, the ostensible consent would be the tainted fruit of that Fourth Amendment violation. United States v. Mendenhall,* 446 U.S. 544, 558, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) ("Because the search of the respondent's person was not preceded by an impermissible seizure of her person, it cannot be contended that her apparent consent to the subsequent search was infected by an unlawful detention."); *United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); *Ferris v. State,* 355 Md. 356, 373–84, 735 A.2d 491 (1999). *The*

*circumstances surrounding and preceding the ostensible granting of consent,* therefore, *loom large in our analysis.* (Emphasis supplied).

Chief Judge Krauser's opinion for the Court in *Epps I* operated on the assumption that the suppression hearing judge had deemed the appellant to be free of any Fourth Amendment restraint and involved, therefore, in nothing more than a mere accosting. See *Swift v. State,* 393 Md. 139, 899 A.2d 867 (2006). Judge Krauser quoted from the ruling of the hearing judge in that regard:

[The] Maryland Court of Appeals says *[appellant was] free to get out of that car and go.* We presume that everybody but the courts should know all the laws. My recollection is the citizen is presumed to know all of the law.

(Emphasis supplied). The *Epps I* opinion then drew a sharp distinction between 1) the appellant's position that he had been seized within the contemplation of the Fourth Amendment and 2) the State's position that the encounter did not even involve the Fourth Amendment.

*[A]ppellant contends* that the circuit court erred in denying appellant's motion to suppress because *appellant was subject to Fourth Amendment seizure at the time that he complied with Deputy Moro's "request" that he lift his shirt,* rendering his compliance involuntary. In response, *the State argues that* appellant voluntarily complied with Deputy Moro's request, and that *the encounter was a "consensual non-constitutional event."*

(Emphasis supplied).

■ In addressing that distinction, *Epps I* quoted with approval from *Perkins v. State,* 83 Md.App. 341 345, 574 A.2d 356 (1990), where this Court had earlier stated:

In assessing voluntariness, *it is necessary to be alert* not only to heavy-handed and overtly coercive investigative techniques but also to "subtly coercive police questions" and to *"the possibly vulnerable subjective state of the person who consented."*

(Emphasis supplied). Whether the person being confronted by the police is or is not at that moment seized within the contemplation of the Fourth Amendment is a significant factor bearing on "the possibly vulnerable subjective state" of that person and on the consequential quality of any ostensible consent.[1]

Between the suppression hearing of May 3, 2006, and our opinion in *Epps I* filed on March 19, 2008, the significant intervening event had been the promulgation by the Supreme Court of *Brendlin v. California* on June 18, 2007. That opinion was the catalyst for our decision in *Epps I*. *Brendlin* held squarely that when the police effect a traffic stop, a passenger in the stopped vehicle has been subjected to a Fourth Amendment seizure of the person just as surely as has the driver. *See also Arizona v. Johnson,* 555 U.S. ——, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009). *Brendlin,* therefore, clari-

---

1. Our further observation in *Graham v. State,* 146 Md.App. at 368, 807 A.2d 75, bears noting:

Initially, *it is hard to accept that even a request for a frisk, let alone a frisk itself, would not constitute such a "show of authority" by a uniformed officer as to push any submission to it into the category of a Fourth Amendment seizure of the person.* Green v. State, 145 Md.App. 360, 802 A.2d 1130 (2002) ("A seizure can occur … by a 'show of authority' coupled with submission to that authority."). *No case has been cited to us,* and we know of none, *in which the consent to a request to be frisked has been deemed to be an act of voluntary consent* rather than submission to a "show of authority."

*The very phrase "consensual frisk" borders on being an oxymoron.* (Emphasis supplied).

The police and prosecutorial "take" on the phenomenon of accosting is frequently disingenuous. In pure theory, an accosting, if it is more than a convenient fiction, is a voluntary conversation between two equals, with neither enjoying any advantage or semblance of control over the other. The officer may no more impose police policy or departmental requirements on a mere accosting than may the civilian impose reciprocal conditions.: "I'm sorry, Officer, but it is my personal policy not to engage in voluntary conversation with armed men. I'll be glad to talk to you, but first you must drop your gunbelt to the ground and then sit down on the curb where I can see your hands at all times. Then we can enjoy our talk together." That's not the way, of course, that voluntary conversations work. Between equals, the required civilities flow in both directions, lest the confrontation escalate, as it almost always does, into something more formal and official than a mere accosting.

fied the constitutional status of the appellant in this case as of the moment he was requested (or directed) to lift his shirt. He had, indeed, been seized within the contemplation of the Fourth Amendment. He had not been merely accosted. Our opinion made it clear that the suppression hearing judge had originally determined to the contrary, to wit, that the appellant had not been subjected to any Fourth Amendment restraint as of the moment when the request was made.

*At the suppression hearing, the circuit court, in considering whether appellant had,* as a passenger in the vehicle, *been seized* by Deputies Gerres and Moro *when he purportedly complied with Deputy Moro's request, stated that the* "Maryland Court of Appeals says [appellant]'s free to get out of that car and go," and that "the citizen is presumed to know all of the law...." *The court therefore did not consider* the stopping of the vehicle in which appellant was a passenger and *his* consequential *detention when it subsequently found that his consent to the search was voluntary and denied his motion to suppress.*

(Emphasis supplied).

Judge Krauser emphatically stated that *Brendlin v. California* thus rendered that conclusion erroneous.

But at that time, *the circuit court did not have the benefit of the* June 18, 2007, *Supreme Court decision in Brendlin v. California,* [551 U.S. 249] 127 S.Ct. 2400, 2405 [168 L.Ed.2d 132] (2007), *which states that "a traffic stop subjects a passenger, as well as the driver, to Fourth Amendment seizure."*

(Emphasis supplied). Accordingly, this case was remanded to the circuit court so that it could reconsider its ruling on the voluntariness of the ostensible consent, with the new factor in that analysis being that the appellant had, indeed, been seized within the contemplation of the Fourth Amendment when the police request for him to lift his shirt was made.

*Because appellant was a passenger in a vehicle that was stopped* by Sheriff's deputies, *he was, under Brendlin seized under the Fourth Amendment* at that time. *Consequently,*

*the court was in error when,* in deciding whether appellant's subsequent compliance with Deputy Moro's request was voluntary, *it discounted* as a factor *the Sheriffs' stopping the vehicle in which appellant was traveling. We shall* therefore *remand this case to the circuit court* without affirmance or reversal of the judgment appealed from *so that its decision* on appellant's motion to suppress *may be reconsidered in light of Brendlin.* In so ruling, we are not suggesting that the trial court reach any particular result.

(Emphasis supplied). That altered status had a possible bearing on the voluntariness of the appellant's response.

### The Second Suppression Hearing

The suppression hearing on remand was held on January 21, 2009. The judge announced that his task was "to reconsider my finding in light of the Supreme Court decision" in *Brendlin v. California.* All hands acquiesced as he stated, "I would assume I'm to use the record of the prior hearing" and "It's purely a legal application of the law to that record." He restated the earlier ruling that was then back on the table for reconsideration, *"I made a finding ... that the defendant consented to raise his shirt,* and so *the question is whether or not that Supreme Court decision would cause me to take a different view of that issue of consent."* (Emphasis supplied). At that point, defense counsel seemed more alert to the possible advantage of circumscribing the proceedings than anyone else. He sensed the danger of suddenly shifting theories of justification and sought to preclude it.

[DEFENSE COUNSEL]: Correct. *And just on consent.*

THE COURT: *Right.*

[DEFENSE COUNSEL]: *Okay.*

THE COURT: I take it we're all on the same wavelength?

[DEFENSE COUNSEL]: Yes, correct, Your Honor.

(Emphasis supplied).

Just a moment earlier, defense counsel had underscored his understanding that the subject matter of the remand hearing

was to be tightly pinned down to the issue of voluntary consent.

THE COURT: Okay, and *so all we have today is argument?*

MR. DeSIMONE: Yes. And *just to clarify our understanding, our reading of the Court of Special Appeals is this is limited solely to the issue of consent, solely to the issue of consent for the search.*

THE COURT: Yeah, I made a finding.

(Emphasis supplied).

The hearing then proceeded in full accord with that general understanding of its purpose and scope. Primary arguments and rebuttal arguments by both defense counsel and the prosecution all confined themselves to the issue of the voluntariness of the ostensible consent and to that issue alone. The hearing concluded with the court's announcing that it would give the matter due consideration.

### A Significant Shifting of Gears

When the court's five-page Memorandum Opinion was filed on April 15, 2009, however, it did not deal with the voluntariness of the appellant's consensual lifting of his shirt. The ruling was framed exclusively in terms of a totally different and unargued issue. The court's rationale had switched dramatically to stop-and-frisk law pursuant to *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

Under that theory, justification for the stop was easy. There was also no problem with respect to the scope of the stop:

*Applying the holding of Brendlin to the subject case, Defendant Epps was seized at the time he had contact with the deputy sheriffs. No issue has been raised by the Defendant as to the validity of the stop* and we concluded that the driver was stopped for speeding after his speed was checked by radar and that *the stop was lawful.*

(Emphasis supplied).

The focus then turned to whether there had been justification for a *Terry* frisk, to wit, whether there had been a

reasonable articulable suspicion that the appellant might be armed.

> *[W]e next turn* to the issue of *whether the Deputy* Moro *had reasonable suspicion to believe that Defendant might have a weapon* concealed on his person.

(Emphasis supplied). The court found that there was justification for a *Terry* frisk.

> *Both Deputy Geres and Deputy Moro described the movements that they observed Defendant making when they approached the vehicle* and initiated contact with the occupants. *Deputy Geres articulated* on the witness stand *that he thought Epps might have a weapon* that he was concealing in the groin area.

(Emphasis supplied). In terms of initiating a frisk, the court concluded:

> At that point, based on his and Deputy Gerres's observations, we believe *either officer had the right to order Epps out of the car and pat him down for a weapon.*

(Emphasis supplied).

The court then, of necessity, got creative in dealing with the permitted scope of the ensuing frisk. It reasoned that the lifting of the shirt was less intrusive than would have been a pat-down and that that characteristic satisfied the demands of the scope limitation.

> However, *we do not believe that such a pat down would be the only recourse.* ... We believe that where the officers have focused on a particular part of the body where a weapon might be in the process of being secreted, *it is less intrusive to ask the person to lift their shirt so that the area in question can be viewed than it is to get them* out of the vehicle, have them spread their legs, put their hands on the roof or hood of the car and be *subjected to a body pat down.* Here, the area of concern was identified and *an instruction to lift the shirt was less than intrusive than a body pat down.* In *Terry* a pat down was used and on the facts of the case that was reasonable. *Here, there was no need for*

*a full pat down because the area of concern was identified based on the observations of the officers.*

(Emphasis supplied).

We will defer for the moment any discussion, on the merits, of the scope of that *Terry* frisk, as we consider first the threshold question of the shift itself in the theory on which suppression was to be decided.

### Protesting the Switch of Constitutional Contexts

■ Aggrieved at the unannounced shift in constitutional context, the appellant, not unexpectedly, cries, "Foul!" He protests that he was declared the loser of a game he was, in net effect, never invited to play. The first suppression hearing, the first appeal to this Court, and then the suppression hearing on remand had all focused on establishing the evidentiary predicate for and arguing the controlling caselaw on the issue of voluntary consent, initially in an apparent accosting situation beyond the pale of the Fourth Amendment and then, in the wake of *Brendlin v. California*, within the context of Fourth Amendment restraint. In no event, the appellant insists, was he ever asked, expressly or implicitly, to argue the law of *Terry v. Ohio*. There was no occasion to argue, for instance, 1) that there was no adequate justification for a *Terry* frisk or 2) that the order to lift his shirt exceeded the permitted scope of a *Terry* frisk. The appellant, in effect, protests that the rules were changed after the game had been fully played and all that remained to be done was the posting of the final result on the scoreboard.

Arguing for more than is necessary for him to prevail on this appeal, however, the appellant further insists that the deadline for introducing a new Fourth Amendment theory into the deliberations was by the end of the first suppression hearing of May 3, 2006. He would tightly limit, by legal fiat, the second suppression hearing to a reargument of what would have been appropriate argument at the end of the first suppression hearing, save only for the addition of *Brendlin v. California* to the discussional mix. We do not agree that the

second suppression hearing was so rigidly circumscribed, for that would be rank gamesmanship.

On remand, the issue was still the broad question of whether the search of the appellant was reasonable within the contemplation of the Fourth Amendment. The only limitation on considering a new Fourth Amendment theory of justification was that of fairness to the parties, making certain that they had full opportunity to present testimony bearing on the new theory and then to argue the merits of that theory. The State could properly have indicated that it intended to argue stop-and-frisk law at the hearing on remand. It did not, however, do so. The court, before or during the hearing, could have asked the parties to address *Terry v. Ohio.* It did not, however, do so. Even at the eleventh hour, after the second hearing had adjourned but before the ruling was announced, we do not believe that the court would have been precluded from reconvening the hearing and requesting the parties to argue (and perhaps to present additional testimony with respect to) an additional Fourth Amendment theory. It did not, however, do so. Doctrinal flexibility is to be desired, so long as it does not work unfairness on the parties to the debate. In net effect, the second suppression hearing was as tightly limited as the appellant wished it to be, but only because that was the way that events played out and not because of any preordained procedural dictate.

### Controlling the Agenda

■ At the other end of the continuum, the State insists that the appellant was free to raise and argue any Fourth Amendment theory he wished and that it was he himself who failed, at his peril, to go beyond the consent issue. That, however, is not true. The State ignores the allocation of the burden of proof. In this case, it was the State that dictated the agenda and the appellant's only duty was to respond to the propositions actually advanced by the State.

As the proponent of the motion to suppress the physical evidence, it was, of course, the appellant who bore the initial burdens of both production and persuasion. It was the appel-

lant who, *per* his motion, chose the Fourth Amendment as the field on which to do battle. It was the appellant, moreover, who had then to show that he enjoyed a Fourth Amendment coverage in the first instance and that a search and/or seizure occurred in ostensible violation of that protection.

In *Herbert v. State*, 136 Md.App. 458, 481–82, 766 A.2d 190 (2001), this Court clearly laid out this allocation of the initial burden.

> *As a general rule, the moving party on any proposition, civil or criminal, has both the burden of production and the burden of persuasion.* It is the moving party who attempts tó persuade a judge somehow to alter the *status quo.*

> In a criminal trial, the *status quo—the norm—is that evidence of a defendant's guilt that is relevant, material, and competent will be admitted.* It is *the defendant* who seeks to alter that *status quo—who seeks a departure from that norm—when he seeks to exclude relevant, material, and competent evidence* of guilt in order to serve some extrinsic purpose, such as deferring the police from future unreasonable searches and seizures. *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). To *the moving party is allocated the burden of making the case* for such an alteration of the *status quo—for such a departure from the norm.*

(Emphasis supplied). *See also Duncan and Smith v. State,* 27 Md.App. 302, 304–05, 340 A.2d 722 (1975); *Graham v. State,* 146 Md.App. 327, 346–47, 807 A.2d 75 (2002).

 At that initial stage of a suppression hearing, it is the State that enjoys the luxury of not having to do anything. It may respond to the defense if it chooses to do so, but it is under no such obligation. *Herbert v. State,* 136 Md.App. at 484, 766 A.2d 190, went on to explain:

> *The State,* though it may choose to react to such an effort, *is not required to do anything. It does not automatically assume any risk of non-production or of non-persuasion. It is entitled to be an interested but completely passive party to such a proceeding.* It is the defendant who must

make a case for the suppression of evidence. *The State is not required to make a case for the non-suppression of evidence.* If a judge should convene a suppression hearing and if both parties should rest without saying a word, the State would win that nothing-to-nothing tie. More precisely stated, the defendant would lose the nothing-to-nothing tie. *Duncan and Smith v. State,* 27 Md.App. at 317, 340 A.2d 722.

(Emphasis supplied).

Once the hearing on such a motion progresses into the merits of the Fourth Amendment, however, there is a possibility that the allocation of the burdens may shift. Should it develop that the search in issue was pursuant to a judicially issued warrant, on the one hand, the burdens will remain firmly fixed on the defendant to show that the search was unreasonable. *Duncan and Smith v. State,* 27 Md.App. at 304–05, 340 A.2d 722, made the point:

> *When the police execute a search under authority of a facially adequate warrant, it is presumptively good and the burden is upon the defendant to establish its invalidity. Where the evidence is inconclusive in this regard, the State wins.* United States v. Ventresca, *380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965);* Aguilar v. Texas, *378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964);* Alderman v. United States, *supra* [394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969) ]; Hignut v. State, *17 Md.App. 399, 408–410, 303 A.2d 173.*

(Emphasis supplied).

### The Burden Shifted to the State

Once it is established, however, as it was in this case, that the search in issue was warrantless, a tectonic shift occurs in the allocation of the burdens. The respective roles of the State and of the defense are procedurally and dramatically reversed. *Herbert v. State,* 136 Md.App. at 485, 766 A.2d 190, discussed the shifting of allocation.

Although the initial burden of production (of going forward) is always on the defendant, *there are circumstances with respect to the Fourth Amendment merits which, if established, may trigger an evidentiary presumption that operates to shift the burdens of both production and persuasion.* The very possibility of such a shift is a direct consequence of the Supreme Court's strong preference for searches and seizures pursuant to judicially approved warrants over warrantless searches and seizures.

(Emphasis supplied).

██ Where, as in this case, the search in issue was warrantless, the burden of justifying such a warrantless search shifts to the State. *Duncan and Smith* explained:

*Where, ...* the defendant establishes initially that *the police proceeded warrantlessly, the burden shifts to the State to establish* that strong *justification* existed for proceeding under one of the "jealously and carefully drawn" exceptions to the warrant requirement. *Where the evidence is inconclusive in this regard, the defendant wins.*

27 Md.App. at 305, 340 A.2d 722 (emphasis supplied). *Graham v. State*, 146 Md.App. at 349, 807 A.2d 75, was emphatic in this regard:

When the State's investigation, for whatever reason, *follows the disfavored warrantless route*, on the other hand, *the procedural ball ends up in the State's court. The State assumes the burden of overcoming the presumption of invalidity by demonstrating*, by however many steps are necessary, *that the warrantless search satisfied one of the firmly established exceptions to the warrant requirement. In such a posture, it is the State that loses the tie.*

(Emphasis supplied).

If at the suppression hearing in this case neither the State nor the appellant had said a word, the State would have lost because it would have failed to satisfy its allocated burden of overcoming the presumptive invalidity of the warrantless search of the appellant. The evidence would have been suppressed. There was no burden on the appellant to say or to

do anything. The State sought, however, in the words of *Graham v. State,* to show that "the warrantless search satisfied one of the firmly established exceptions to the warrant requirement." It is not enough that some of the evidence might arguably have alluded to a variety of Fourth Amendment theories. In justifying a presumptively invalid warrantless search, it is for the State to "call the suit." It could have advanced, in the alternative, more than one theory, but did not. The State chose to go with voluntary consent alone. The appellant responded in kind, arguing that the ostensible consent was not voluntary. Under no circumstance would it have been appropriate, and certainly not necessary, for the appellant to raise in a vacuum and then attempt to refute any or all of a wide variety of other possible theories of justification that were not raised either by the State or by the trial judge. The appellant's obligation was only a responsive one. He responded to the only issue that was raised. He did not respond to other issues, stealth issues, that were not raised. When we use the past participle "raised," let it be clear, we do not mean "allusively suggested or adumbrated." It was not the appellant who dictated the agenda.

### Framing the Contention

Our result on this appeal is certain; it is just a matter of how to state the issue. The appellant frames his contention as the non-preservation by the State of the *Terry* stop-and-frisk theory, and that is, we suppose, a feasible if somewhat indirect phraseology for what is actually before us. Although the appellant brands the State with the attempted untimely resort to a non-preserved issue, it was actually, of course, the suppression hearing court and not the prosecution that injected the *Terry* issue into the contest late in the game and perhaps after the final whistle had blown. In such phrasing, however, the appellant may, of course, be using "the State" in its broadest sense, to embrace the court as well as the prosecutor. In any event, it is now, on appeal, the State that necessarily serves as the proponent for whatever was done at

the trial level. From the appellant's point of view, it matters little whom he casts as the procedural villain.

In terms of assessing the timeliness of raising an issue, moreover, it is worth noting that all parties play by the same rules. Judge Hollander well expressed the parity in *State v. Jones*, 138 Md.App. 178, 234, 771 A.2d 407 (2001), *aff'd.*, 379 Md. 704, 843 A.2d 778 (2004):

> The State has not referred us to any legal authority to support its contention that the rules and practices that generally apply with respect to waiver, or that govern the content of reply briefs, do not apply to the State in the circumstances of this case. Our effort to uncover relevant cases that might shed light on this issue leads us to conclude that *the State is, indeed, held to the same rules of practice and procedure as other litigants. Even in the face of an appellate reversal of a conviction, the State can be found to have waived or abandoned an argument that might have led to the affirmance of that conviction if the appropriate argument had been timely made.*

(Emphasis supplied).

The cases relied on by the appellant all deal, to be sure, with the phenomenon of injecting a new issue into the case for the first time at the appellate level. In the unusual chronology of this case, by contrast, the new issue was injected into the case for the first time in the rendering of a ruling on a suppression motion but after the suppression hearing had been concluded. Because the generative concern undergirding the caselaw, however, is one of fairness to a defendant in terms of notice and opportunity to respond, we are dealing with a chronological distinction without a doctrinal difference. The caselaw is, therefore, apposite to the issue before us.

### New Issues and the Chance to Respond

■ In *McCray v. State*, 122 Md.App. 598, 716 A.2d 302 (1998), the State at trial expressly offered several hearsay statements as recognized exceptions to the Hearsay Rule under Maryland Rule 5–802.1(b). On appeal the statements

were held to be inadmissible under that theory. The State then sought, for the first time on appeal, to show that the admissibility ruling was correct but for a different reason, to wit, pursuant to Maryland Rule 5–616(c). Speaking through Judge Sonner, this Court rejected the effort to introduce a new theory of admissibility for the first time on appeal.

> Although, under *Holmes* [*v. State*, 350 Md. 412, 712 A.2d 554 (1998) ], the State "is not required to assert the purpose for which it is seeking admission" of the statements, here, *the trial judge asked the State for its basis for offering the statements* and specifically asked if the basis was Md. Rule 5–802.1(b). *The State told the court that it was offering the statements under that rule.* As such, *it* does not and *cannot, on appeal claim that the statements should be admitted under Md. Rule 5–616(c).*

122 Md.App. at 610, 716 A.2d 302 (emphasis supplied).

In *Bell v. State*, 96 Md.App. 46, 56, 623 A.2d 690 (1993), this Court recognized that the State might have had a very strong argument if it had challenged the defendant's Fourth Amendment standing in a timely fashion. Such an issue, however, could not be injected into the case for the first time at the appellate level.

> Under the circumstances, *the State might have had a very viable challenge to the standing of the appellant to question their entry into the automobile. Such challenge,* however, *was never made. It is too late at the appellate stage to raise an issue not timely raised at the suppression hearing. Steagald v. United States,* 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981).

(Emphasis supplied).

In *Bell v. State*, the State also attempted to raise for the first time on appeal a second new argument, in effect arguing for a new or extended *Carroll Doctrine* justification for a further search predicated on something found in an earlier *Carroll Doctrine* search that had been terminated. We again declined to consider a new and untimely raised issue.

"Although an argument might someday be made for extending a search such as this based upon some almost Newtonian proposition that the discovery of *some* contraband suggests the likely presence of *more* contraband yet to be discovered, *it is enough to note that no such argument was made by the State in this case, either at the suppression hearing or before us.*"

96 Md.App. at 54, 623 A.2d 690 (emphasis supplied).

On certiorari review by the Court of Appeals in *State v. Bell,* 334 Md. 178, 184, 638 A.2d 107 (1994), Judge Karwacki's opinion affirmed the decision of this Court not to consider the untimely raised theory of Fourth Amendment justification.

[T]he State argues that the Court of Special Appeals erred in failing to address that argument as it pertains to the second search. Because *we find that the intermediate court did not err ... in declining to consider the State's Carroll doctrine argument* as it pertains to the search and seizure of the Fila bag and its contents, we need not address the validity of the second search.

(Emphasis supplied). The Court of Appeals further explained:

*Had the State initially argued in the trial court that* the police had probable cause for more than one vial, or that *the officers' actions constituted one extended search* for an undetermined quantity of narcotics, *this argument would perhaps stand on stronger ground. It was the State, however, which initially framed its case in terms of two separate searches* and argued probable cause for the first search only. *The trial court and the intermediate appellate court merely accepted the State's presentation of the case, and we will do the same.*

*Id.* (emphasis supplied).

In *State v. Bell,* the State strenuously pressed the notion that an appellate court has the discretion to take notice of an unpreserved argument. The Court of Appeals responded that it is a discretion only rarely exercised and only when the parties will not be prejudiced by the late injection of the unpreserved issue.

*The State concedes that it did not argue the applicability of the Carroll doctrine at the suppression hearing, but it deems this fact irrelevant in light of an appellate court's discretion to affirm a decision of a trial court on grounds that had not been relied upon by either the trial court or the parties.* In support of its argument, the State cites *Robeson v. State*, 285 Md. 498, 403 A.2d 1221 (1979).... *Robeson* is couched in discretionary language, e.g., "this Court will not *ordinarily* consider an issue which was not raised in the petition," and "an appellate court will *normally* affirm a trial court on a ground adequately shown by the record." ... Clearly, *Robeson stands not for the proposition that an appellate court must examine new, alternative grounds for upholding a trial court's decision, but only for the proposition that it may do so if it deems such review appropriate.* Moreover, the language of *Robeson* refers to an alternative ground "adequately supported by the record." *If a party's presentation* of his or her case *was prejudiced by an opponent's failure to raise an issue at the trial stage* (i.e., the party did not adduce the requisite evidence), *then the record is necessarily lacking* and will not be "adequate" to support the alternative ground raised on appeal.

334 Md. at 187–88, 638 A.2d 107 (emphasis supplied).

Judge Karwacki's opinion emphasized that the primary factor in the decision to consider an unpreserved issue is that of fairness to the parties.

The interests of fairness are furthered by "requir[ing] counsel to bring the position of their client to the attention of the lower court at the trial so that the trial court can pass upon, and possibly correct any errors in the proceedings." *Although* it is clear that *an appellate court does have the discretion to affirm a decision on a ground not raised below, this discretion should be exercised only when it is clear that it will not work an unfair prejudice to the parties* or to the court. *A criminal defendant could suffer unfair prejudice if,* for example, *the defendant's response to a new*

*argument* posited by the State on appeal *depends on evidence which was not offered in the trial court.*

334 Md. at 189–90, 638 A.2d 107 (emphasis supplied).

When a new theory is belatedly injected into an adjudication, a party, such as the appellant in this case, may not have been alerted to the need for more fully developing what might be pertinent evidence with respect to the new theory. Such party, moreover, certainly has had no occasion to argue with respect to the new theory.

> In the case *sub judice, all of the facts necessary to assert the Carroll doctrine as a justification for the warrantless search at issue were known to the State at the time of trial, and the State could have argued the Carroll doctrine in their alternative* without diluting its primary emphasis on the inventory justification.... *By structuring its argument in such a way, the State dissuaded Bell from offering evidence on the matters* of probable cause for the second search and exigency of the circumstances. Here, as in *Giordenello, Bell had no reason to cross-examine the police on these matters.* Moreover, because warrantless searches are presumptively unreasonable, and the burden of proving the applicability of an exception to the warrant requirement rests on the State, *Bell cannot be expected to rebut possible justifications for the search on his own initiative. The State may not lead the defendant and the trial court down a primrose path, only to leave them stranded when, on appeal, the State deems it advantageous to change its strategy.*

334 Md. at 191, 638 A.2d 107 (emphasis supplied).

In *Jones v. State,* 379 Md. 704, 843 A.2d 778 (2004), the Court of Appeals again emphasized fairness to the parties as the prime consideration in whether to permit a new issue to enter the contest at the last minute.

> *The primary purpose* of Rule 8–131(a) *is to ensure fairness for all parties* and to promote the orderly administration of law. Although *the interests of fairness generally are furthered by requiring the issues to be brought first to the*

*attention of the trial court* so that the trial court may pass upon it in the first instance, the appellate court has the discretion to excuse the default and consider the issue. *This discretion should be exercised only when it is clear that it will not work an unfair prejudice to the parties* or to the court. While *the authority to review unpreserved issues* is discretionary, it *should not be exercised when it will work an unfair prejudice to the parties.* Therefore, *the animating policy behind Rule 8–131(a) is to ensure fairness for the parties involved* and to promote orderly judicial administration.

*Id.* at 713–14, 843 A.2d 778 (emphasis supplied). Judge Raker's opinion went on to explain precisely how the late introduction of an unexpected issue, regardless of by whom, could leave a defendant languishing in the lurch.

First, the appellate court should consider whether the exercise of its discretion will work unfair prejudice to either of the parties. For example, with respect to the parties, *a new argument presented by the State would work unfair prejudice to a criminal defendant if its validity depended upon evidence not adduced at the trial level.* In such a case, an appellate court's *consideration of the argument would most likely be an abuse of its discretion* under Rule 8–131(a) *because it would be manifestly unfair to the defendant who had no opportunity to respond to the argument* with his own evidence to the contrary.

*Id.* at 714, 843 A.2d 778 (emphasis supplied).

Although all of this caselaw, as we earlier noted, involves the untimely introduction of a new issue or a new theory into the case by the State at the appellate level rather than the introduction of a new theory or new issue by the suppression hearing judge as he announces his ruling, the unfair or adverse impact on the defendant is precisely the same in either event. The appellant here was never on notice that his lifting of his shirt was to be assessed pursuant to the frisk requirements of *Terry v. Ohio.* His cross-examination of the two deputy sheriffs might well have focused more closely on

whether one or both were fearful that the appellant may have had a weapon and on precisely what he had done to generate such a fear. He might well have more closely explored why they chose not to conduct a routine *Terry* pat-down for weapons. Were they hoping to discover evidence of crime as well as a weapon? Of critical importance, defense counsel would have had the opportunity to argue those issues before the suppression hearing judge. Most significantly, attention could have been focused on the permissible scope of a *Terry* frisk. He was denied that opportunity. The words of the Supreme Court in *Giordenello v. United States,* 357 U.S. 480, 488, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958), are poignantly apposite.

> *To permit the Government to inject its new theory into the case at this stage would unfairly deprive petitioner of an adequate opportunity to respond.* This is so because in the District Court *petitioner,* being entitled to assume that the warrant constituted the only purported justification for the arrest, *had no reason to cross-examine Finley or to adduce evidence of his own to rebut the contentions that the Government makes here for the first time.*

(Emphasis supplied). See also *Steagald v. United States,* 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981).

We hold that the suppression hearing ruling, based on an unraised, undeveloped, and unargued Fourth Amendment theory, was in error and that the physical evidence should, therefore, have been suppressed.

### An Alternative Holding: The Permitted Scope of a Frisk

Were, *arguendo,* the merits of the *Terry* frisk properly before us, we would hold that directing the appellant to lift his shirt exceeded in scope the tightly limited intrusion permitted by *Terry v. Ohio.* In terms of the initial justification for a frisk, to wit, articulable suspicion that the appellant may have had a weapon, this case would present a close call were we to address the merits. Rather than presume to try to resolve this close question without the guidance of argument from counsel on both sides, we will assume, purely *arguendo,* that

there was articulable suspicion for a frisk and go on to the follow-up question of the permitted scope of such a frisk.

Before doing so, however, we note the very interesting argument now made by the appellant that only knowledge possessed by Deputy Moro, the frisking officer, should have had a bearing on the justification for the frisk, and not other knowledge, possessed perhaps by Deputy Gerres if not communicated to Deputy Moro. The appellant quotes from *State v. Blackman*, 94 Md.App. 284, 298–99, 617 A.2d 619 (1992), in this regard.

> As we assess the reasonableness of the fear that the appellee might be armed, we note that *it was Officer Matthews, not Officer Stephens, who attempted to execute the frisk.* We note that *it was Officer Matthews, not Officer Stephens, who articulated reasons for believing that a frisk for weapons was necessary. It is only those facts known to the articulating officer that may be included in the articulable suspicion computation.* Thus, *we will eschew reliance on Officer Stephens' knowledge* that the appellee was a drug dealer and the virtually "automatic" right to frisk for weapons that would flow from that knowledge. . . . *Officer Matthews did not know that.* We will also eschew reliance on the knowledge available to the more extended police team that the recent arrest of the appellee was for the carrying of a deadly weapon. *Officer Matthews did not know that.* What an officer does not know cannot be the basis for any suspicion on his part. We will, therefore, *confine ourselves to scrupulously to what was known or reasonably believed by the frisking officer.*

(Emphasis supplied). At the very least, this is an argument that the appellant should have had an opportunity to make before the suppression hearing judge. We are, however, for the moment assuming that there was justification for a frisk.

 We turn to the question of scope. The permitted scope of any search is whatever is necessary to serve the purpose of that search—but not one little bit more. The purpose—the only purpose—of a *Terry* frisk is to discover the

presence of suspected offensive weapons that could be used to harm the stopping officer. It is most emphatically not to discover the presence of evidence. The Supreme Court has accordingly scrupulously limited the scope of a *Terry* frisk to a patting down of the exterior of the clothing surface. The reasoning is that such a pat-down is enough to detect the presence of most weapons—guns, knives, black jacks, brass knuckles—and that that is sufficient, therefore, to serve the limited purpose. A frisk is not a permitted procedure to discover the presence of evidence of crime. That requires additional justification.

Directing the appellant to lift his shirt went beyond the limited scope of a frisk. It revealed "a small, clear plastic baggie . . . protruding from the top of his pants." A pat-down of the appellant would not have permitted the recovery of that baggie. It was not a hard metallic object that could have been mistaken for a weapon. Although, to the touch through clothing, it might have aroused suspicion, it by no means communicated probable cause as per the "plain feel doctrine" of *Minnesota v. Dickerson,* 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993). A properly limited frisk of the appellant would not have produced the cocaine, for the possession of which the appellant is now facing 25 years of imprisonment without the possibility of parole.

■ The suppression hearing judge reasoned, *sua sponte,* that the lifting of the shirt was reasonable because it was less intrusive than a pat-down would have been. The degree of intrusiveness, however, is not the controlling criterion. Nor is the duration of the intrusion. Nor is the degree of embarrassment that the intrusion might cause.[2] The critical limitation is that the intrusion must be only that which is necessary to

---

2. Would lifting her shirt, for instance, also have been less intrusive to a female stoppee? Is that, moreover, a question for the judge or for the frisking officer to decide on behalf of the stoppee? If a female stoppee were directed to empty her pockets on the assumption that that would be less intrusive (embarrassing to her) than to be closely patted down by a male stopping officer, and out of her pockets came pouring narcotics, would the narcotics be admissible as the product of a properly limited *Terry* frisk? What price gallantry? She was saved

detect the presence of a weapon—and nothing more. In this case, the alternative intrusion self-evidently detected something other than the presence of a weapon and the appellant is paying a heavy price for that incremental revelation.

*State v. Smith,* 345 Md. 460, 693 A.2d 749 (1997), is very much in point. The issue was close to the one now before us, even if not precisely identical.

> The specific question before the Court *is whether a police officer,* after patting down a suspect's outer clothing and detecting no weapons, *may further verify that a suspect is unarmed by lifting the suspect's shirt to reveal the waistband of his pants.* For the reasons set forth below, we hold that *the police officer acted improperly in engaging in this secondary, more intrusive search.*

345 Md. at 463, 693 A.2d 749 (emphasis supplied). Judge Chasanow set out the principles that control the scope of a *Terry* frisk.

> The purpose of a *Terry* frisk is not to discover evidence, but rather to protect the police officer and bystanders from harm. In accordance with this narrow purpose, *the scope must be "confined . . . to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer."* Furthermore, the objective is to discover weapons readily available to a suspect that may be used against the officer, not to ferret out carefully concealed items that could not be accessed without some difficulty. General exploratory searches are not permitted, and *police officers must distinguish between the need to protect themselves and the desire to uncover incriminating evidence.*

345 Md. at 465, 693 A.2d 749 (emphasis supplied).

Whereas lifting the appellant's shirt here was the initial check, lifting the appellant's shirt in *State v. Smith* was a

---

embarrassment, but she's now doing 25 years. Should the stoppee have an option in such matters? These are all questions that might have been argued before the suppression court, had the issue of a properly limited *Terry* frisk been on the agenda. It was not.

"double check." In either event, it was more than was necessary to discover weapons.

Applying these principles to the facts of the instant case, we conclude that when Officer White failed to detect a weapon-like object, his frisk of Smith should have ceased. Instead, Officer White stated that he decided to "double check" the pat-down. *He testified, "I pulled [Smith's] shirt back to make sure I didn't miss anything."* He further explained, *"I pulled the shirt out just so I could see the waistband to make sure nothing was sticking out* even though I patted him, like to double check...."* The trial judge also found that upon completing the initial pat-down, "the officer did one more thing, which was to tug at the shirt...." In verifying the results of the pat-down by a more intrusive search, *Officer White exceeded the lawful bounds of a Terry frisk.*

345 Md. at 470–71, 693 A.2d 749 (emphasis supplied). In that case, as in this, a plastic baggie containing cocaine was revealed in the defendant's waistband. It was there held that the evidence should have been suppressed as the product of an intrusion that went beyond the limited scope of a *Terry* frisk.

In *McDowell v. State,* 407 Md. 327, 965 A.2d 877 (2009), there was reason to stop and frisk a passenger in a pickup truck that had been subjected to a traffic stop. Within the reach, lunge, or grasp of the passenger was a gym bag large enough to hold a weapon. The gym bag as well as the passenger was properly subject to a frisk. The issue before the Court of Appeals was the scope of the frisk. The passenger was ordered to open the bag and it was found to contain heroin. Judge Wilner's opinion held that the opening of the bag exceeded the scope of a permitted *Terry* frisk and that a pat-down of the bag would have been sufficient to detect the presence of a weapon.

What *Terry* allows are *"necessary* measures" to determine whether a person is carrying a weapon. As we have observed, *because the search is solely a protective one and not one to discover evidence, "it must be confined in scope to an intrusion reasonably designed to discover guns,*

*knives, or other hidden instruments* for the assault of the police officer." *In the search of a person, it ordinarily must be confined, at least initially, to a pat-down of the outer clothing.*

407 Md. at 340, 965 A.2d 877 (emphasis supplied).

In *Bailey v. State*, 412 Md. 349, 368–69, 987 A.2d 72 (2010), Judge Greene wrote for the Court of Appeals:

> Even if Officer Lewis had reasonably believed that the petitioner was armed and dangerous, therefore providing the basis for a proper *Terry* frisk, the search in the present case exceeded the scope of a proper protective frisk. *A proper Terry frisk is limited to a pat-down of the outer clothing "not to discover evidence of a crime, but rather to protect the police officer and bystanders from harm" by checking for weapons. . . .* Generally, *"a pat down is . . . a proper, minimally intrusive means of determining whether a suspect is armed."*
>
> *The officer may not exceed the limited scope of a patdown for weapons to search for contraband.*

(Emphasis supplied).

In *In re David S.*, 367 Md. 523, 544, 789 A.2d 607 (2002), Judge Raker had similarly observed:

> The Supreme Court has made it clear that *"if the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under Terry and its fruits will be suppressed."*

(Emphasis supplied)

An unorthodox police procedure, even if not particularly intrusive, is not an acceptable functional equivalent of a true frisk or pat-down if it could reveal more than the presence of a weapon. As an alternative holding, the evidence in this case should have been suppressed as the product of a *Terry* frisk that was unconstitutional because it was excessive in scope.

**ORDER DENYING SUPPRESSION REVERSED. CASE REMANDED FOR A VACATING OF THE APPEL-**

LANT'S CONVICTIONS. COSTS TO BE PAID BY HAR-
FORD COUNTY.

